**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| MICHAEL WARREN MADDOX, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:20-CV-00075-ALM-|
| v. | § | CAN |
| | § | |
| COMMISSIONER, SSA, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff brings this appeal for judicial review of the final decision of the Commissioner of

Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g) denying his claim for benefits.

After reviewing the Briefs submitted by the Parties, as well as the evidence contained in the

administrative record, the Court recommends that the Commissioner's decision be **AFFIRMED**.

**BACKGROUND**

On June 12, 2017, Plaintiff Michael Warren Maddox ("Plaintiff") filed an application for

Title XVI Supplemental Security Income ("SSI") [TR 10, 168].  Plaintiff alleges an onset of

disability date of August 1, 2014 [TR 10, 168, 196].  Plaintiff was born on April 27, 1974, making

him forty-three (43) years of age at the time of alleged onset of disability [TR 74].  Plaintiff's age

classification is that of a "younger person… more limited in [his] ability to adjust to other work

than persons who have not attained age 45."  *See* 20 C.F.R. § 404.1563(e).  Plaintiff has not

engaged in substantial gainful activity since June 12, 2017 (the date of his application) [TR 12,

191].   On September 13, 2017, the claim was initially denied [TR 10, 96-99], and upon

reconsideration on January 3, 2018 [TR 10, 102-104], Plaintiff's application was again denied.  On

September 17, 2019, Plaintiff requested an administrative hearing ("Hearing") [TR 124-125],

which was held before an Administrative Law Judge ("ALJ") on December 4, 2018 [TR 10, 42-46, 107].  At Hearing, the ALJ heard testimony from Plaintiff, Plaintiff's attorney representative, and a vocational expert ("VE") [TR 53-73].  On February 25, 2019, the ALJ issued an unfavorable decision, finding at step two that Plaintiff has the severe impairments of major depressive disorder with psychotic features, polysubstance abuse, and adult antisocial behavior [TR 7-27].  Plaintiff requested review of the ALJ's decision by the Appeals Council [TR 1-4, 164-167].  The Appeals Council denied Plaintiff's request on November 30, 2019, making the decision of the ALJ the final decision of the Commissioner [TR 1-6].  On January 31, 2020, Plaintiff filed the instant suit [Dkt. 1].  On September 22, 2020, the Administrative Record was received from the Social Security Administration [Dkt. 15].  Plaintiff filed his Opening Brief on October 22, 2020 [Dkt. 17], the Commissioner filed its Brief in Support of the Commissioner's Decision on December 19, 2020 [Dkt. 18], and Plaintiff filed his Reply Brief on December 29, 2020 [Dkt. 19].

***Relevant Medical Records***

Relevant to the arguments raised by Plaintiff are the medical opinions and evaluations of consultative examiner Dr. Mac Walling ("Dr. Walling"), treating physician Dr. Kristen Grable ("Dr. Grable"), and the SAMCs findings.  It is undisputed that the ALJ evaluated each of these opinions in creating Plaintiff's RFC.  Under Title XVI, a claimant cannot receive payment for SSI for any time prior to the application date, regardless of the length of disability.  Nonetheless to make the record complete, the regulations call for the development of the medical history of an SSI claimant for at least the 12 months preceding the month in which a plaintiff files his or her application unless there is a reason to believe that development of an earlier period is necessary. 20 C.F.R. § 416.912(b)(1).  As Plaintiff filed his application for SSI in June of 2017, Plaintiff's medical history would generally be developed going back to at least June of 2016.  Because

Plaintiff alleged an onset date of August 1, 2014, development of his medical history going back to the earlier onset date can be found warranted or necessary. *See, e.g., Taylor v. Colvin*, 16-00731, 2016 WL 8309674, *8 (E.D. La. Dec. 27, 2016), *report and recommendation adopted*, 16-00731, 2017 WL 713555 (E.D. La. Feb. 2, 2017). At Hearing, both Parties agreed to inclusion of Plaintiff's medical records predating his Application in the administrative record. Plaintiff's counsel raised no objection to any of the Hearing exhibits (which include Plaintiff's medical records back to the date of onset) and, in fact drew special attention to Dr. Walling's consultative examination from November 2015 both at Hearing and in his brief to the Appeals Council [*See* TR 54-55 (ATTY:…"[t]he Consultative Examination in November 2015 showed quite a lot of problems, some issues with polysubstance abuse which Dr. [Grable] also addressed in his form")].

### Dr. Walling

On November 23, 2015, Plaintiff presented to Dr. Walling for a consultative examination for evaluation of his mental impairments [TR 321-326]. Plaintiff recounted his educational difficulties stating he could spell but had difficulty with math; he was retained twice in the Ninth Grade; he was in Special Education from the Third Grade onward; and he reported other school-related difficulties typically associated with Attention-Deficit/Hyperactivity Disorder (ADHD), Oppositional Defiant Disorder (ODD), or Unspecified Disruptive, Impulse-Control, and Conduct Disorder [TR 323].

Dr. Walling noted Plaintiff's criminal history, which included shoplifting as a juvenile, misdemeanor possession in 2007 and incarceration, public intoxications, and probation for delivery of a controlled substance [TR 324]. Dr. Walling also took note of Plaintiff's social tendencies and alleged difficulties in adaptive functioning. Though Plaintiff offered that he has high anxiety and paranoia around people, Plaintiff's ability to communicate and interact

appropriately with the examiner was relatively intact, in that he was polite and able to follow simple directions [TR 324]. However, Dr. Walling noted Plaintiff's social interaction was idiosyncratic and his other communication skills were likewise impaired [TR 324].

Dr. Walling also detailed Plaintiff's activities of daily living and appearance. Overall, Dr. Walling observed that the claimant's appearance was unkempt and he appeared anxious [TR 324]. Plaintiff's fluctuating motivation adversely effected his ability to manage and maintain a home, i.e., perform cleaning and laundry chores [TR 324]. Plaintiff explained that he could cook, use the microwave, and read and follow recipes; however, he does not assist with grocery shopping because of paranoid ideation [TR 324]. He does not handle his finances but is able to make change and count money [TR 324]. Plaintiff did not have a driver's license, but he could use public transportation [TR 324]. Plaintiff appeared dirty, and Dr. Walling noted that Plaintiff does not dress, groom, or take care of his personal hygiene without reminders [TR 324]. Dr. Walling reported that Plaintiff's thought content was coherent and Dr. Walling could follow the his train of thought easily [TR 324]. Importantly, despite his self-reports, there were no illogical, irrational, or delusional thought content [TR 324].

Dr. Walling also reported the results of a series of tests he performed with Plaintiff, including: that serial 3 subtraction from 100 was performed accurately; Plaintiff named the President of the United States and his predecessor and named 4 out of 10 recent Presidents since 1960; he could spell the word "world" backward; he could name the examiner at the close of the evaluation; he had difficulty answering some common sense questions about everyday safety concerns and interpersonal relationships; he was able to recall 2 out of 4 words after five minutes (inferring impaired recent memory); he repeated 5-digits forward, 3- digits backward, and 5-digits sequencing, which was low average attention span, short-term memory, and concentration (WAIS-

IV Digit Span subtest score, 7) [TR 325]. Dr. Walling observed that the Plaintiff did not appear to be responding to external stimuli [TR 325].

Lastly, Dr. Walling reviewed Plaintiff's alcohol and substance abuse. Plaintiff admitted to alcohol and substance abuse ("Everything except Heroin") since about 1984 [TR 325]. From about 2000 to 2011, the claimant drank a fifth of rum and 30-pack of beer per night [TR 325]. Plaintiff claimed his last drug use was in 2014. Plaintiff explained that he smoked a pack of cigarettes daily [TR 325]. Dr. Walling assessed diagnosis of polysubstance abuse disorder, severe (reportedly in remission), methamphetamine- induced bipolar and related disorder (provisional), unspecified personality disorder (antisocial, paranoid) (provisional), adult antisocial behavior, adolescent antisocial behavior, alleged past history of sexual abuse in childhood, and tobacco use disorder, severe [TR 326]. Dr. Walling noted Plaintiff's diagnoses were confounded by a life-long, and probably, ongoing polysubstance abuse [TR 326].

**Dr. Grable**

After this consultative examination, Plaintiff treated with Dr. Grable off and on. Although Plaintiff appears to be scheduled for visits approximately every three months, the record reflects he regularly misses his appointments [TR 371, 375, 376, 377]. Additionally, Dr. Grable's progress notes reveal that Plaintiff does not adhere to his prescribe medication regimen [ TR 399].

Dr. Grable completed a Questionnaire on August 15, 2017 [TR 360-365]. Dr. Grable found Plaintiff would have slight difficulty remembering locations and work-like procedures and slight difficulty understanding, remembering carrying out very short and simple instructions [TR 362]. Dr. Grable found Plaintiff would have marked limitation in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances and sustain an ordinary routine without

special supervision [TR 362].  Dr. Grable describes Plaintiff as a very ill person psychiatrically, with depressed mood and psychosis resulting in numerous psychiatric hospitalizations and suicide attempts [TR 362].  Dr. Grable describes the claimant as "barely functioning" [TR 362].  She also found marked impairment in Plaintiff's ability to work in coordination with or in proximity to others without being distracted by them, extreme impairment in the ability to complete a normal workweek without interruptions from psychologically based symptoms, marked impairment in the ability to perform at a consistent pace with a standard number and length of rest periods, and finds Plaintiff would miss four or more days each month from work [TR 363].  Dr. Grable also found marked impairment in the ability to interact appropriately with the general public and marked impairment in the ability to accept instruction and respond appropriately to criticism from supervisors [TR 362].  Dr. Grable found extreme impairment in the Plaintiff's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes [TR 362].  Dr. Grable found marked impairment in the Plaintiff's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness [TR 362].  Dr. Grable noted that Plaintiff's use of alcohol or other substances impacted her assessment, and that Plaintiff should not be permitted to manage his own benefits as he would likely spend them on alcohol and illicit drugs [TR 364].

Dr. Grable completed a Mental Capacity Assessment on September 15, 2017 [TR 406-410].  Dr. Grable found the following limitations. Plaintiff's ability to follow one or two step oral instructions to carry out a task was mildly limited [TR 408].  His ability to recognize a mistake and correct it or identify and solve problems and his ability to sequence multi-step activities was moderately limited [TR 408].  His ability to use reason and judgment to make work-related decisions was markedly limited [TR 408].  His ability to work at an appropriate and consistent

pace, or complete tasks in a timely manner, his ability to ignore or avoid distractions while working, and his ability to sustain an ordinary routine and regular attendance at work was markedly limited [TR 409]. His ability to work close to or with others without interrupting or distracting them was moderately limited [TR 409]. His ability to work a full day without needing more than the allotted number or length of rest periods during the day was extremely limited [TR 409]. His ability to adapt to changes and his ability to set realistic goals was markedly limited [TR 409]. His ability to distinguish between acceptable and unacceptable work performance and his ability to make plans independently of other was moderately limited [TR 409]. His ability to manage psychologically based symptoms and ability to maintain personal hygiene and attire appropriate to a work setting was extremely limited [TR 409]. His ability to cooperate with others or ask for help when needed and his ability to understand and respond to social cues was moderately limited [TR 410]. Lastly, his ability to handle conflicts with others, his ability to respond to requests, suggestions, criticism, correction, and challenges, and his ability to keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness was extremely limited [TR 410]. Dr. Grable opined that he displays "inappropriate behavior related to his psychotic disorder" and his alcohol and substance abuse had a small degree of impact on her findings [TR 410].

**SAMCs – Dr. Lee Wallace and Dr. Germain**

At the initial level, on September 12, 2017, Dr. Wallace completed Plaintiff's disability determination [TR 76-79]. Dr. Wallace found that the evidence was not sufficient to render a substantive decision [TR 76]. On reconsideration, on December 22, 2017, Dr. Jean Germain made the following findings [TR 90]. She found that Plaintiff had no limitations with personal care but does not change daily [TR 86]. She opined that his alleged limitations were not wholly supported

by the evidence in the file [TR 86]. She explained that the "statements made by the claimant regarding impairment related functional limitations and restrictions cannot reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record" [TR 87]. Under 'B' criteria listings she noted that she evaluated him under 12.04 for Depressive, Bipolar, and Related Disorders [TR 86]. She found that his ability to remember or apply information; his ability to interact with others; his ability to concentrate, persist, or maintain pace; and his ability to adapt or manage oneself were all moderately limited [TR 86]. Under the 'C' criteria, she stated that "evidence does not establish the presence of the 'C' criteria" [TR 86]. Lastly, Dr. Germain found that Plaintiff "can understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors and respond appropriately to changes in a routine work setting" [TR 90]. In reaching these conclusion, Dr. Germain had available to him the opinions of Dr. Walling and Dr. Grable [TR 83-84].

## FINDINGS OF THE ALJ

### *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. §404.1520. First, a claimant engaged in substantial gainful employment at the time of his disability claim remains not disabled. *Id*. § 404.1520(b). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. *Id*. § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id*. § 404.1520(d). Fourth, a

claimant with a severe impairment that does not correspond to a listed impairment is not considered disabled if he can perform his past work based on his residual functional capacity. *Id.* § 404.1520(e). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. *Id.* § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability, and at the last step, the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

***ALJ's Disability Determination***

After hearing testimony and conducting a review of the facts of the Plaintiff's case, the ALJ determined through the sequential evaluation process that the Plaintiff did not suffer from a disability [TR 10-31]. At step one, the ALJ found Plaintiff has not engaged in substantial gainful activity since June 12, 2017, the application date [TR 12]. At step two, the ALJ found Plaintiff has severe impairments for major depressive disorder with psychotic features, polysubstance abuse, and adult antisocial behavior [TR 12-19]. At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) [TR 19-21]. More specifically, the ALJ found that "the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.08" [TR 19]. At step four, the ALJ determined that Plaintiff maintains the following residual functional capacity:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but must avoid exposure to extremes of heat or unprotected heights. The claimant is limited mentally to performing simple, routine tasks and simple-decision making in an environment that involves few, if any, workplace

changes.  The claimant is limited to occasional interaction with supervisors, coworkers and the public.

[TR 21].  At the final step, the ALJ determined claimant maintains the residual functional capacity to engage in work available in the national economy, specifically:

- Assembler, DOT #: 706-684-002, light, SVP 2;
- Cleaner, DOT #: 323.687-014, light, SVP 2;
- Laundry folder, DOT #: 369.687-018, light, SVP 2

[TR 26].  Based on this determination, the ALJ concluded Plaintiff was not disabled from June 12, 2017, through the date of the ALJ's decision, February 25, 2019 [TR 26].

## STANDARD OF REVIEW

In an appeal under § 405(g), a court "reviews a Commissioner's denial of social security disability benefits 'only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Webster v. Kijakazi*, No. 20-60856, 2021 WL 5563333, at *1 (5th Cir. Nov. 29, 2021) (quoting *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (quotation marks and citation omitted)); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert denied, 514 U.S. 1120 (1995); 42 U.S.C. § 405(g).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  Substantial evidence "need not be a preponderance." *Webster*, 2021 WL 5563333, at *1 (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)). The ALJ resolves conflicts in the evidence; the Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, though the Court will scrutinize the record to determine if evidence exists.  *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995); *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment.  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see Cook*, 750 F.2d at 393.  "Substantial gainful activity" is determined by a five-step sequential evaluation process.  20 C.F.R. §404.1520(a)(4).

## ANALYSIS

Plaintiff asserts two points of error on appeal: (1) the ALJ's RFC is unsupported by substantial evidence as she failed to provide a legally sufficient explanation for her assessment of Dr. Grable; and (2) the ALJ erred at step three in that the listing analysis is unsupported by substantial evidence because the ALJ failed to address information from the relevant period, relying primarily on an examination that pre-dated Plaintiff's Application.

### *Substantial Evidence Supports the ALJ's RFC Assessment*

The RFC is an assessment based on all the relevant evidence of a claimant's maximum ability to do work on a sustained basis in an ordinary work setting despite his or her impairments.[1] 20 C.F.R. § 404.1545(a); *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  The RFC is the most a claimant can do despite his physical limitations.  The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The Court must determine whether the record as a whole "yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ."  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *see Perez v. Barnhart*, 416 F.3d 457, 461 (5th Cir. 2005); *Jones v. Saul*, No. 4:20-CV-00772-BP, 2021 WL 2895867, at *4-5 (N.D. Tex.

---

[1] When considering a claimant's RFC, the Commissioner assesses an applicant's physical, mental, and sensory abilities, evaluates how those abilities apply to that applicant's work-related functioning, and finally considers whether that applicant can sustain work-related activities in a work setting on a regular and continuing basis.  *See* 20 C.F.R. § 404.1545(b)-(d); S.S.R. 96-8p, 1996 WL 374184 at *3-4.

July 9, 2021) (finding no error where the ALJ determined that [the treating physician's] opinion was inconsistent with the record as to the limitations he expressed).[2]

Plaintiff's first point of error advances that in formulating the RFC the ALJ failed to properly address Plaintiff's treating physician Dr. Grable's opinion, urging that the ALJ improperly assessed the supportability and consistency of the opinion, and cited insufficient evidence supporting a stated reason for disregarding her opinion—Plaintiff's noncompliance with treatment [Dkt. 17 at 8]. As to this latter point, Plaintiff specifically argues that the ALJ provided only one instance of non-compliance and failed to properly consider the basis for Plaintiff's non-compliance under SSR 16-3p, and such error prejudiced Plaintiff [Dkt. 17 at 10]. In Response, the Commissioner seemingly agrees that the ALJ did not expressly articulate her evaluation of Dr. Grable's opinion in terms of supportability and consistency but argues that "the ALJ's reasoning—Plaintiff's poor effort and noncompliance—read in concert with the balance of the decision, describes an opinion that is unsupported and inconsistent with the other record evidence" [Dkt. 18 at 6-7].

### Noncompliance with Prescribed Medical Treatment

"An ALJ is entitled to consider noncompliance with prescribed medical treatment as a factor in the overall disability determination." *Luzenia K. v. Saul*, No. 3:19-CV-01006-BT, 2020 WL 2574933, at *6 (N.D. Tex. May 20, 2020) (citations omitted). Failure to follow prescribed treatment is relevant in determining whether disability exists and is an indication of nondisability. SSR 16-3p, cited by Plaintiff, requires the ALJ to consider a plaintiff's statements about the

---

[2] The ALJ "does not have 'to state the weight given to each symptom and diagnosis in the administrative record.'" *Mary C. R. v. Kijakazi*, No. 3:20-CV-00286-BT, 2021 WL 4476764, at *3 (N.D. Tex. Sept. 30, 2021) (quoting *Michelle K. M. v. Berryhill*, No. 3:17-cv-3044, 2019 WL 1243355, at *13 (N.D. Tex. Mar. 18, 2019)). Failure to "mention a particular piece of evidence does not necessarily mean that [the ALJ] failed to consider it" when the ALJ "states explicitly that [she] considered the entire record" in the opinion. *Id.* (quoting *Hammond v. Barnhart*, 124 F. App'x 847, 851 (5th Cir. 2005)).

intensity, persistence, and limiting effects of his symptoms, which the ALJ must then consider in light of the objective medical evidence and other evidence in the record. *Anderson v. Berryhill*, No. 3:16-CV-0853-BK, 2017 WL 3589543, at *5 (N.D. Tex. Aug. 18, 2017). SSR 16-3p specifically instructs:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the medical evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints…

Soc. Sec. Admin., SSR 16–3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct. 25, 2016). With respect to Plaintiff's noncompliance the ALJ's Decision states, in pertinent part:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not entirely consistent with the medical evidence….
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent. The claimant has a long history of depression with symptoms of a bipolar disorder. He also has a history of noncompliance and substance abuse. His noncompliance includes not taking his medication, or changing the dosage without consulting Dr. Grable and missing numerous appointments. The claimant has been in and out of jail related to his substance abuse and parole violations. The record demonstrates that he improves with compliance is enforced.
>
> …
>
> As noted above, lack of compliance seems to have a large impact on the degree of depression and paranoia experienced by the claimant.

[TR 22, 24].    A review of the record reflects the ALJ properly considered Plaintiff's noncompliance and the reasons for such noncompliance, as detailed in the decision.  *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) ("An ALJ has discretion to use a plaintiff's noncompliance with treatment in making a determination about Plaintiff's subjective complaints, as long as the ALJ's conclusions are supported by substantial medical evidence.").

Plaintiff argues, contrary to the ALJ's recitation, that he had limited incidents of non-compliance with his treatment plan or medication and that no record evidence demonstrates that compliance improved his symptoms.  Plaintiff briefs "[i]n building her case of non-compliance and poor effort, the ALJ could not provide many instances to support her decision. The only possible evidence of malingering was from one treatment note date six years prior to the application date" [Dkt. 17 at 9-10].  Plaintiff also testified at Hearing his mental condition was "touch and go" sometimes the medications help and sometimes they do not [TR 61].

At Hearing, in December 2018, Plaintiff testified that he hears voices and sometimes he wants to hurt people, so he feels it is not safe for him to leave the house [TR 59].  In conjunction with this testimony, the ALJ inquired into Plaintiff's substance abuse; Plaintiff stated under oath that the last time he used drugs was in December 2017 and he was using "[p]retty much everything" [TR 59].  While the ALJ did not impugn Plaintiff's credibility in any fashion; Plaintiff's testimony at Hearing was untruthful.  The record reflects Plaintiff's continued drug use after December 2017; indeed, Plaintiff himself admitted elsewhere in the record to using methamphetamines and opioids in January 2018 [TR 582], and cannabis and amphetamine use in August 2018 [TR 569].  Thus, as the ALJ properly noted Plaintiff has a continued history of substance abuse, which Dr. Grable acknowledged impacted Plaintiff's symptoms [TR 364].

The administrative record similarly belies Plaintiff's other arguments and testimony, reflecting a long and proven history of noncompliance with his treatment plan, including no-shows for appointments and nonadherence to his prescribed medication regimen, both pre-and-post-dating Plaintiff's Application [TR 371 (Plaintiff no-showed to doctor's appointment scheduled for July 6, 2017 and did not call to cancel or reschedule), 375 (Plaintiff no-showed to a doctor's appointment scheduled for July 7, 2016; he scheduled transportation but was not at home at pick-up time), 376 (Plaintiff no-showed for a doctor's appointment scheduled for July 10, 2017 and did not call to cancel or reschedule), 377 (Plaintiff no-showed for "doctor no-show group" meeting on July 19, 2017); 399 (Dr. Grable's progress notes from August 17, 2017 visit indicate that Plaintiff is "[n]onadherent to psych meds")].

Plaintiff's medical records similarly reflect that when compliant with his medications Plaintiff's symptoms improved [TR 510 (medications showing decrease in symptoms December 2016), 520 (reported improvement on medications in April 2017), 531 (medications are effective in July 2017)].  The ALJ's Decision points directly to further instances where Plaintiff did improve while complying with his medication.  For example, on February 13, 2017, when Plaintiff was evaluated by Lakes Regional MHMR Center, he stated he was taking his medications as prescribed and is continuing to notice that his moods are improving [TR 510].  On March 13, 2017, he said he was taking his medication as prescribed, but he was having issues sleeping and with anxiety; later in that same conversation he reported that he is not taking his anxiety medications because they were ineffective [TR 513].  On April 17, 2017, Plaintiff reported that he was taking his medications as prescribed and his sleeping had improved [TR 520].  On May 15, 2017, Plaintiff reported that he was continuing to take his medication as prescribed, he said he was getting better sleep and while he still would "hear things" these symptoms were improving [TR 522].  On

May 22, 2017, Plaintiff reported that he was taking his medications, getting better sleep, that his moods had improved, that he was not experiencing any depression, and that he had fewer anger outbursts [TR 24].   Even considering only this short timespan (from February to May 2017) demonstrates the marked improvement in Plaintiff's condition when in compliance with his medication.  *Rodriguez v. Berryhill*, No. H-17-3102, 2019 WL 403860, at *9 (S.D. Tex. Jan. 3, 2019) ("These records are consistent with the ALJ's determination that, overall, Rodriguez was not compliant with taking her prescribed medications, which suggested the symptoms were not as limiting as the claimant alleged in connection with this application.") (cleaned up), *report and recommendation adopted*, No. H-17-3102, 2019 WL 398181 (S.D. Tex. Jan. 29, 2019); *DeJonette v. Berryhill*, 681 F. App'x 320, 322 (5th Cir. 2017) ("The ALJ thus found that [claimant's] noncompliance with prescribed treatment made his testimony as to the severity of his symptoms not credible.").

Plaintiff next argues that, even if compliance did improve his condition, the ALJ ignored that Plaintiff's mental health affected his ability to comply [Dkt. 17 at 11].  Interestingly, in support of this point, Plaintiff cites medical evidence pre-dating Plaintiff's Application, while elsewhere faulting Defendant and the ALJ for relying on the same.  Plaintiff also cites no authority addressing circumstances like those here, where Plaintiff was untruthful in his testimony at Hearing, and the totality of Plaintiff's medical records reflect he had improvement if he took his medications, was compliant with his treatment, and stopped his continued illegal drug abuse.  Again, an ALJ has discretion to use a plaintiff's noncompliance with treatment in making a determination about Plaintiff's subjective complaints, as along as the ALJ's conclusions are supported by substantial medical evidence.  Here, the ALJ fully outlined the history of Plaintiff's mental impairments; and, still found that the degree of Plaintiff's impairments was impacted by noncompliance.  The ALJ

complied with SSR 16-3p's requirements.  It is clear, here, "[t]he ALJ did not base [her] finding of not disabled solely on Plaintiff's noncompliance with treatment, but on the record as a whole, considering noncompliance as a factor," as discussed more fully *infra*. *Benson v. Saul*, No. 3:20-cv-1974-E-BH, 2022 WL 868706, at *11 (N.D. Tex. Mar. 8, 2022), *report and recommendation adopted*, No. 3:20-cv-19740E-BH, 2022 WL 865886 (N.D. Tex. Mar. 23, 2022).

### *Supportability/Consistency of Dr. Grable's Opinion*

All Parties agree that the Social Security Administration's updated rule for assessing medical opinion evidence governs Plaintiff's claims.  *See* 20 C.F.R. § 404.1520c.  The old rule required the ALJ to give a treating physician's opinion "controlling weight" in the absence of specific mitigating factors, and to "always give good reasons" in the determination for the weight given to a treating physician's opinion.  *Id*. § 404.1527(c)(2).  The new rule eliminates the "controlling weight" given to treating physicians.  *Id*. § 404.1520c(a).  The new rule, 20 C.F.R. § 404.1520c, provides that the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from the [claimant's] medical sources."  *Id*. § 404.1520c(a).[3]  A medical opinion is a statement about what functional limits a claimant may have from an impairment.  *Id*. § 404.1513(a)(2).  Rather, the ALJ shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of

---

[3] In transitioning to the new rule, the administration noted, "[t]he current policies that focus upon weight, including the treating source rule, have resulted in reviewing courts focusing more on whether we sufficiently articulated the weight we gave opinions rather than on whether substantial evidence supports the Commissioner's final decision." *Webster v. Comm'r*, No. 3:19-cv-97-DAS, 2020 WL 760395, at *3 (N.D. Miss. Feb. 14, 2020).  "In other words, the new rules are an attempt to eliminate confusion about a hierarchy of medical sources. . . . Reviewing courts, therefore, will now look first and foremost simply to whether substantial evidence exists to support an ALJ's opinion and not whether one opinion was correctly weighted in relation to any other(s)." *Id*.

the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. *Id*. § 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. *See Id*. §§ 404.1520(b)(2), 404.1520c(a). Supportability means the degree to which objective medical evidence supports the medical opinion at issue, and consistency looks to the consistency between different medical opinions across the record. *Id*. § 404.1520c(c)(1)-(2).[4] The new rule also changed the articulation requirements for how the ALJ considers each medical opinion. The new articulation requirements state:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Id*. § 404.1520c(b)(1)-(2); *see Moore v. Comm'r*, No. 3:20-CV-241-SA-DAS, 2021 WL 2834395, at *2 (N.D. Miss. July 7, 2021) (finding that the medical source regulations do not "require the ALJ to expressly address the persuasiveness of every opinion within every report").

---

[4] "With respect to 'supportability,' 'the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase,'" and consistency is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Luckett v. Kijakazi*, No. 4:20-CV-04002, 2021 WL 5545233, at *4 (S.D. Tex. Nov. 26, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)) (quoting *Vellone v. Saul*, No. 1:20-CV-00261-RAK-HP, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021). "Considering the newness of the regulations, there is a dearth of caselaw [at present] concerning what constitutes a sufficient 'explanation' of supportability and consistency under 20 C.F.R. § 404.1520c(b)(2)." *Liguez v. Kijakazi*, No. 4:20-CV-02798, 2021 WL 4943321, at *4 (S.D. Tex. Aug. 11, 2021), *report and recommendation adopted sub nom. Liguez v. Comm'r of Soc. Sec.*, No. 4:20-CV-2798, 2021 WL 4941997 (S.D. Tex. Oct. 22, 2021).

The ALJ explained that he was not persuaded by Dr. Grable's opinion.  The Commissioner accedes that, in doing so, the ALJ failed to expressly articulate the supportability and consistency factors of Dr. Grable's opinion, but vehemently argues there is no prejudice because when read in concert with the rest of the opinion it describes an opinion unsupported and inconsistent with other record evidence [Dkt. 18 at 6]. To put this argument in context, the ALJ provided the following finding after a lengthy summary of Dr. Grable's opinion:

> The undersigned finds the treating physician's lacking in persuasiveness, as the treatment history shows poor effort and compliance.  The claimant report that when he takes his medications, his symptoms improve.  Moreover, Dr. Grable's statements finding the claimant permanently disabled are on issues reserved to the Commissioner (20 CFR 416.920(c)(3)(i) and (vi)).  By definition the opinions are inherently neither valuable nor persuasive and no analysis is necessary (20 CFR 416.920(c)).

[TR 25].  The Court agrees that though the ALJ's evaluation of Dr. Grable's opinion is brief, it is embedded within a much more detailed discussion of Plaintiff's longitudinal medical record:

> Consultative examiner, Dr. Walling, noted on November 23, 2015 that the claimant self-directed his activities of daily living with some assistance. The claimant's ability to communicate and interact appropriately with the examiner was relatively intact, in that he was polite and able to follow simple directions. Social interaction was idiosyncratic. Other communication skills were likewise impaired. The claimant had difficulty following and concentrating on the plots of television shows. The claimant could read and understand the newspaper. The claimant enjoyed playing video games as a hobby or interest. The claimant's ability to manage and maintain a home, i.e., perform cleaning and laundry chores, is adversely affected by fluctuating motivation.
>
> The claimant stated he could cook, use the microwave, and read and follow directions and recipes. Although, he could assist with grocery shopping, he did not because of paranoid ideation. Although able to make change and count money, the claimant's mother handled the bills and finances (Exhibit 2F/3-4).
>
> Although progress notes from Lakes Regional MHMR Center dated January 7, 2016, indicate the claimant was out of rehabilitation and had been clean for 12 months, he was taking no psychotropic medications. As such, he reported consistent symptoms of major depressive disorder, depressed mood, command hallucinations, and reported isolation when having increased symptoms. The claimant reported more problems with anger. The claimant also reported lack of interest and no

motivation. Diagnoses included major depressive disorder, recurrent; opioid abuse, uncomplicated; other stimulant abuse, uncomplicated; hallucinogen abuse, uncomplicated; alcohol abuse, uncomplicated; and cannabis abuse, uncomplicated (Exhibit 9F/34-35).

While incarcerated, the claimant answered "no" to the following questions on January 14, 2016: Do you believe you have any special gifts, were you in special education classes, were you ever placed in a juvenile detention center, have you been convicted of an offense considered to be a sexual offenses, have you ever with little or no provocation experienced loss of control that resulted in serious assault of another person, and have you ever been the victim of violence (Exhibit 3F/4-5). The claimant indicated he had a high school diploma. He denied ever making suicide attempts. The clinician observed no mental health symptomatology (Exhibit 3F/6-8). On March 9, 2016, it was noted that the claimant had no apparent mental health needs at that time (Exhibit 3F/13).

On June 28, 2018, emergency room personnel found the claimant to have a normal mood and affect. They considered the claimant's behavior normal (Exhibit l lF/3-7).
The claimant completed a Function Report on December I, 2017

As for medical opinion(s) and prior administrative medical finding(s), we will not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from your medical sources. We fully considered the medical opinions and prior administrative medical findings in your case as follows:

The undersigned does not find the GAF scores ranging from 49 to 50 persuasive (Exhibits IF and 7F). The GAF score is a clinician's rating of an individual's overall psychological, social and occupational functioning on a scale of0 to 100. A GAF of 49 to 50 represents serious symptoms or any serious impairment in social, occupational, or school functioning (Diagnostic and Statistical Manual of Mental Disorders, 4th ed., American Psychiatric Assoc., Text Revision, 2000 (DSM- IV)). A GAF score is not necessarily an accurate longitudinal indicator of a claimant's overall level of functioning. It is not standardized or based on normative data. It is subjective assessment on symptom severity or functioning from one individual at one point in time based on claimant's self-report. The GAF score can factor in socioeconomic and other items that are not directly related to mental functioning.

The undersigned has also considered the opinion of Dr. Walling. Consultative examiner, Dr. Walling, noted on November 30, 2015 in his report that the claimant came for a clinical interview and mental status examination only to help determine his current level of intellectual and interpersonal functioning. Based upon his presentation, reported history, formal school experience, vocational history and the mental status examination, Dr. Walling estimated the claimant's level of intellectual functioning to be within the Borderline to Low Average range.

The claimant presented in little or no physical discomfort. Contradicting self-reports of "Extreme anxiety, mood swings, and feelings of sadness," he presented in moderate to severe psychological distress. Dr. Walling noted that the previous evaluation on July 28, 2003, noted diagnostic impressions of Polysubstance Dependence (reportedly in remission), Bipolar Disorder (by history), Adult Antisocial Behavior, and Antisocial Personality features. Generally consistent with previous impressions, Dr. Walling noted that this protocol suggested a provisional Amphetamine-Induced Bipolar Disorder. However, Dr. Walling noted that diagnoses were confounded by a life-long, and probably, ongoing Polysubstance Abuse and provisional Personality Disorder (reported emotional dysregulation; interpersonal discord; disregard for and violation of the rights of others, failure to conform to social norms, repeatedly performing acts that are grounds for arrest, deceitfulness, and reckless disregard for safety of self or others; suspects that others are exploiting, harming, or deceiving him; perceives attacks and is quick to react angrily). Based upon risk factors noted above, Dr. Walling expressed the opinion is that this places him in a risk category of moderate to severe danger to self and others. Contraindicating this risk factor of suicidal ideation, however, the claimant is making long-term plans for the future (e.g., applying for SST Disability), in treatment at the MHMR, taking psychotropic medication with positive benefits, and reportedly sober. In Dr. Walling's opinion, the claimant is unable to manage benefit payments in his own interest (by his own self-reports), but can understand the meaning of filing for benefits (Exhibit 2F/6).

The undersigned observes that Dr. Walling appears to be describing the claimant's behavior when he is not complying with treatment and engaging in abuse of drugs or alcohol. As noted above, lack of compliance seems to have a large impact on the degree of depression and paranoia experienced by the claimant. The undersigned finds this opinion partially persuasive.

A doctor at Lakes Regional MHMR, Kristen Grable, M.D., completed a Questionnaire on August 15, 2017, at the request of the claimant's attorney. Dr. Grable found the claimant would have slight difficulty remembering locations and work-like procedures and slight difficulty understanding, remembering carrying out very short and simple instructions. Dr. Grable found the claimant would have marked limitation in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances and sustain an ordinary routine without special supervision. Dr. Grable describes the claimant as a very ill person psychiatrically, with depressed mood and psychosis resulting in numerous psychiatric hospitalizations and suicide attempts. Dr. Grable describes the claimant as "barely functioning". The doctor also finds marked impairment in the claimant's ability to work in coordination with or in proximity to others without being distracted by them, extreme impairment in the ability to complete a normal workweek without interruptions from psychologically based symptoms, marked impairment in the ability to perform at a consistent pace with a standard number

and length of rest periods, and finds the claimant would miss four or more days each month from work. Dr. Grable also finds marked impairment in the ability to interact appropriately with the general public and marked impairment in the ability to accept instruction and respond appropriately to criticism from supervisors. Dr. Grable finds extreme impairment in the claimant's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Grable finds marked impairment in the claimant's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (Exhibits 5F and 8F). Dr. Grable completed a Food Stamp Questionnaire on August 13, 2017, finding the claimant permanently disabled (Exhibits 12F and 14F).

The undersigned finds the treating physician's lacking in persuasiveness, as the treatment history shows poor effort and compliance. The claimant reports that when he takes his medications, his symptoms improve. Moreover, Dr. Grable's statements finding the claimant permanently disabled are on issues reserved to the Commissioner (20 CFR 416. 920c(c)(3)(i) and (vi)). By definition the opinions are inherently neither valuable nor persuasive and no analysis is necessary (20 CFR 416. 920c(c)).

The undersigned has also considered the prior administrative findings and opinions of the State agency medical consultants. Lee Wallace, Ph.D., found insufficient evidence to make any finding on September 12, 2017 (Exhibit 1A).

Jean Germain, Ph.D., found on December 22, 2017 that the claimant could understand, remember and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors and respond appropriately to changes in a routine work setting (Exhibit 3A/10).

The undersigned finds Dr. Germain's opinion partially persuasive and concurs with the finding that the claimant would be limited to only simple instructions. However, the progress notes from MHMR consistently note anti-social personality traits under Axis II. The claimant experiences paranoia. It is difficult to determine how much of this is due to lack of compliance and his history of drug abuse. However, the undersigned concludes the claimant is more limited in his interaction with supervisors, coworkers and the public than was found by the State Agency medical consultant.

[TR 22-25]. There is "little authority discussing what an ALJ must do to adequately 'explain'

supportability and consistency or what happens when those discussions are missing." *See Moore*

*v. Saul*, No. 3:20-cv-48-DPJ-MTP, 2021 WL 754833, at *3 n.1 (S.D. Miss. Feb. 26, 2021).

Looking at the totality of the ALJ's Decision, even if the ALJ erred in failing to discuss the

supportability and consistency factors more fully, this error does not justify remand here.[5] *See Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (quoting *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)).[6] The ALJ's narrative discussion shows the lack of supportability and consistency, that the ALJ's persuasiveness findings are supported by substantial evidence in the record, and permits meaningful judicial review. *See Walsh v. Comm'r of Soc. Sec.*, No. 4:21-cv-00552, 2022 WL 2874710, at *6 (N.D. Tex. July 7, 2022), *report and recommendation adopted*, No. 4:21-cv-00552, 2022 WL 2872498 (N.D. Tex. July 21, 2022) ("But because the ALJ's explanation addresses the consistency and supportability factors, permits the judicial review set forth above, and is supported by substantial evidence, the undersigned finds no error."); *see also Jesse Ray H v. Comm'r of Soc. Sec.*, No. 4:21-cv-1709, 2022 WL 3566844, at *4-5 (S.D. Tex. Aug. 18, 2022) (affirming ALJ's decision even though "the ALJ did not specify which pieces of evidence in the record and evidence at hearing Dr. Canio's opinion is inconsistent with, the ALJ outlined in detail Plaintiff's testimony, his reported daily activities, and his medical records before evaluating the medical opinions"); *see also Dominick S. v. Kijakazi*, No. 3:20-cv-03473, 2022 WL 2874705, at * (N.D. Tex. May 12, 2022) (affirming the ALJ's decision where "[t]he ALJ's narrative explanation for the moderate limitation on Plaintiff's concentration, persistence, and pace

---

[5] As the "party seeking to overturn the Commissioner's decision[,]" Plaintiff bears the "burden to show that prejudice resulted from an error." *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012). "Prejudice can be established by showing that the additional considerations 'might have led to a different decision.'" *Mettlen v. Barnhart*, 88 F. App'x 793 (5th Cir. 2004) (quoting *Newton*, 209 F.3d at 458 (5th Cir. 2000)). Prejudice is not substantiated by the evidence of record [Dkt. 17 at 9].

[6] As a final point, the Court agrees with the ALJ's assessment that Dr. Grable's findings that Plaintiff is unable to work are "[b]y definition, the opinions are inherently neither valuable nor persuasive" [TR 25]. The ALJ determines whether a claimant's severe impairments and functional limitations prevent him from working. Any statements by Dr. Grable as to whether Plaintiff can work remain opinion evidence, which "is inherently neither valuable nor persuasive to the issue of whether [claimant is] disabled." See 20 C.F.R. § 404.1520b(c); *Neely v. Barnhart*, 512 F. Supp. 2d 992, 997 (S.D. Tex. 2007) (citing *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003)) (citations omitted) (a treating physician's statements that a claimant is "disabled" or "unable to work" are not entitled to any deference).

describes how the limitation is supported by and consistent with [other medical evidence]"), *report and recommendation adopted*, No. 3:20-cv-03473, 2022 WL 2872490 (N.D. Tex. July 20, 2022).

### The ALJ Did Not Err at Step Three

Plaintiff argues, in his second point of error, that the ALJ erred in finding that he did not fall under the 12.04 or 12.08 listing analysis. "The claimant has the burden of proving that [his] impairment or combination of impairments meets or equals a listing." *Johnson v. Comm'r*, SSA, No. 4:21-cv-00118, 2022 WL 2919500, at *4 (N.D. Tex. June 27, 2022), (citing *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990), *superseded by statute on other grounds as stated in McCloskey v. Colvin*, No. CV 15-5223-SP, 2016 WL 5745077 at *7 (D. Cal. Sept. 30, 2016)), *report and recommendation adopted*, No. 4:21-cv-00118, 2022 WL 2918111 (N.D. Tex. July 25, 2022). "For a claimant to show that his impairment matches [or meets] a listing, it must meet *all* of the specified medical criteria." *Zebley*, 493 U.S. at 530 (emphasis in original). An impairment, no matter how severe, does not qualify if that impairment exhibits only some of the specified criteria. *Id.* The court will find that substantial evidence supports the ALJ's finding at step three if the plaintiff fails to demonstrate the specified medical criteria. *Selders v. Sullivan*, 914 F.2d 614, 619-20 (5th Cir. 1990).

At issue here are the listings 12.04 for depressive, bipolar, and related disorders and 12.08 for personality and impulse-control disorders. 20 CFR pt. 404, subpt. P. app. 1 §§ 12.04, 12.08. To satisfy 12.04 a claimant must satisfy paragraphs "A and B, or A and C." *See id.* Listing 12.08 only contains paragraphs A and B, and both must be satisfied to meet the listing. *See id.* § 12.08. "Paragraph A of each listing ... includes the medical criteria that must be present in [Plaintiff's] medical evidence." *Id.* § 12.00(A)(2)(a). Paragraph B of each listing provides the functional criteria and a rating scale to evaluate how Plaintiff's mental disorders limit his functioning. *See*

*id.* §§ 12.04(B), 12.08(B).  Specifically, paragraph B tasks the ALJ with deciding whether Plaintiff has one "extreme" limitation or two or more "marked" limitations of the four areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  *See id.*  Paragraph C of listings 12.04 provides the criteria used to evaluate serious and persistent mental disorders.  To satisfy the paragraph C criteria, there must be a medically documented history of the disorder over a period of at least two years and evidence of both:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

*Id.* §§ 12.03(C), 12.04(C).

Plaintiff primarily relies on Dr. Grable's opinion to urge he meets these listings [Dkt. 17 at 14 ("Dr. Grable's opinion indicates that Plaintiff's impairments caused marked and extreme limitations in every broad area of mental functioning T 362-64, 408-10. Thus, the evidence from the relevant period shows Plaintiff's mental impairments would meet Listings 12.04 and 12.08")].  As explained in detail *supra*, the ALJ properly found that Dr. Grable's opinion was not persuasive.  Indeed, the ALJ provided a thorough analysis of the Paragraph B and C findings, as follows:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.08.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has a moderate limitation. At the consultative psychological evaluation, the claimant was able to recall 2 out of 4 words after five minutes (inferring impaired recent memory). The claimant repeated 5-digits forward, 3-digits backward, and 5-digits sequencing, which was low average attention span, short-term memory, and concentration (WAIS-IV Digit Span subtest score, 7). This score seemed generally congruent with an estimate of premorbid functioning and did not lend support to the loss or deterioration typically associated with a psychotic or mood disorder, as alleged. Dr. Walling observed that the claimant did not appear to be responding to internal stimuli (Exhibit 2F/5).

In interacting with others, the claimant has a moderate limitation. The claimant states in the Function Report that he spends time with others on the computer. The claimant is able to go out unaccompanied. He states that people make him nervous (Exhibit 8E). The claimant has reported paranoia to the caseworkers at MHMR. Under Axis II, the claimant is noted to have antisocial traits.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. Consultative examiner, Dr. Walling, noted on November 23, 2015 that serial 3 subtraction from 100 was performed accurately, and he named the President of the United States and his predecessor. He named 4 out of 10 recent Presidents since 1960. He named 5 out of 10, with a name prompt (inferring generally impaired remote memory). The claimant could spell the word "world" backward and name the examiner at the close of the evaluation. Dr. Walling noted that serial 3 subtraction from 100 was performed accurately, and he named the President of the United States and his predecessor. He named 4 out of 10 recent Presidents since 1960. He named 5 out of 10, with a name prompt (inferring generally impaired remote memory). The claimant could spell the word "world" backward and name the examiner at the close of the evaluation (Exhibit 2F).

As for adapting or managing oneself, the claimant has experienced a mild limitation. Dr. Walling noted that the claimant self-directed his activities of daily living with some assistance. The claimant's ability to communicate and interact appropriately with the examiner was relatively intact, in that he was polite and able to follow simple directions. Social interaction was idiosyncratic. Other communication skills were likewise impaired. The claimant had difficulty following and concentrating on the plots of television shows. The claimant could read and understand the newspaper. The claimant enjoyed playing video games as a hobby or interest. The claimant's ability to manage and maintain a home, i.e., perform cleaning and laundry chores, is adversely affected by fluctuating motivation. The claimant stated he could cook, use the microwave, and read and follow directions and recipes. Although, he could assist with grocery shopping, he did not because of paranoid ideation. Although able to make change and count money, the claimant's mother handled the bills and finances (Exhibit 2F/3-4).

Because the claimant's mental impairments do not cause at least two "marked" limitations or on "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental functional analysis.

[TR 19-21]. Plaintiff now advances that the ALJ's reliance on Dr. Walling's examination, to discount Dr. Grable, was in error as such examination pre-dated Plaintiff's Application. There is no dispute that Dr. Walling's examination falls after the alleged disability onset date but before the date of Application. Notably, there was no objection to inclusion of the examination in the record at Hearing, Plaintiff's own counsel asked the ALJ at Hearing to take special note of Dr. Walling's examination, and Plaintiff relied upon the examination himself in his brief to the Appeal's counsel [TR 55, 274]. Consider the Plaintiff's attorney's opening statement at Hearing:

Mr. Maddox has had a history of mental problems. He was in special education courses and he was passed on to the ninth grade but we were talking and it sounded like he had maybe a seventh-grade education at the time. He has notes and signed by his doctors as in August of 2017, Dr. Graebel, who he has been seeing for quite a long time listed him down with at least 10 marked limitations in concentration, scheduled, being around any other person. *The Consultative Examination in November of 2015 showed quite a lot of problems, some issues with polysubstance abuse* which Dr. Graebel also addressed in his form. It said that it has some impact but does not account for all his symptoms. *The Consultative Examination noted that he might be a moderate to severe danger to others at the time and he was listed as having borderline to low intelligence range during that time*. He has also had some trouble with his ankle more recently and a history of suicidal and homicidal tendencies with psychotic episodes. I'm not sure that any of his single conditions are going to lead up to a listing level, however, it -- I believe that the

combination of his conditions will make him unable to do productive work in the economy.

[TR 55 (emphasis added)].  Nevertheless, even if the Court were to presume it was error for the ALJ to consider Dr. Walling's opinion, Plaintiff's step three burden cannot be met, where, as here, the ALJ's assessment of Plaintiff's Paragraph B criteria limitations precisely track other medical evidence of record, SAMC Dr. Germain's findings [TR 20-21, 86-87].  Thus, separate, and apart from Dr. Walling, ample evidence in the record supports the Paragraph B limitations found by the ALJ.  Dr. Germain found the medical record evidence did not establish the presence of any of the C criteria, and as to the B criteria, Dr. Germain opined,

> Understand, remember, or apply information: Moderate
> Interact with others: Moderate
> Concentrate, persist or maintain pace: Moderate
> Adapt or manage oneself: Moderate

[TR 86].  Dr. Germain's evaluation was performed after both Dr. Walling and each of Dr. Grable's assessments and expressly considered such medical evidence in finding Plaintiff had only moderate Paragraph B criteria limitations [TR 83-87].

"An error at step three requires reversal *only where a plaintiff meets or appears to meet a listing.*"  *Vidal v. Berryhill*, No. SA-17-CV-00393, 2018 WL 4677892, at *6 (W.D. Tex. June 6, 2018) (emphasis added); *see Coscarelli v. Saul*, No. SA-19-Cam 2021 WL 8053621, at *8 (W.D. Tex. Jan. 29, 2021) ("Reversal is required only if Plaintiff demonstrates that the error affected her substantial rights, such as showing she meets or appears to meet the Listing.").  The ALJ's decision shows that he specifically considered whether Plaintiff's mental impairments satisfy *all* of the specified medical criteria of Listing 12.04 or Listing 12.08, and substantial record evidence shoes Plaintiff did not meet or medical equal such Listings.  *Coscarelli*, 2021 WL 8053621, at *8 (affirming where the medical records did not appear to demonstrate that Plaintiff met the listings).

In sum, the Court finds that the ALJ's Step three conclusion is supported by substantial evidence, and that the ALJ's error, if any, does not require remand.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court recommends the Commissioner's decision be **AFFIRMED.**

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 23rd day of August, 2022.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE

REPORT AND RECOMMENDATION - Page 29